Good morning. May it please the court. My name is Nathan Hoffman. I represent the United States. I'll reserve two minutes for rebuttal. Defendant Dorothy Flowers was the number two person in a criminal tax protester organization that spanned 14 years, that operated a sophisticated warehouse bank operation, that during that time received $186 million in deposits. Had over 900 tax evading clients, and cost the government at least conservatively estimated $5 million in tax losses. Ms. Flowers never accepted responsibility for her actions, went to trial, and a jury found her guilty beyond a reasonable doubt of the count one felony charge for which she was convicted. For all her substantial, significant, and unrepentant conduct, she was sentenced most recently to zero months of imprisonment. Congress has explicitly stated that courts must fashion a reasonable sentence that includes, amongst other things, four principal goals of sentencing. The sentence must reflect the seriousness of the offense conduct. It must promote the respect for the law. It must provide just punishment, and it must afford adequate deterrence. A sentence of zero months of imprisonment does absolutely none of that. It promotes a message of non-deterrence, non-punishment. It sends a message to taxpayers, or tax defiers out there, that if you do this type of conduct, you never accept responsibility for it. It goes on for 14 years, involves multi-million dollars, involves hundreds of clients, that a court, at the end of the day, will say, it's not serious. It's not meritorious at even one day of imprisonment. Well, I mean, you're getting carried away. She was a fairly low-level figure in this operation. You know, the district judge's assessment was that she was, in a rule, it was her husband's relationship with her, and hers to her husband, that was responsible for her conduct here. And to a degree, the guidelines are driven by the amount, but the judge wasn't by the amount of money. I mean, you could have a, you know, if the amount of money was less, her guidelines would have been lower. So why can't the judge make an assessment that her role in the overall scheme didn't warrant jail time? He did give her a, he didn't censor her to nothing, did he? He didn't censor her to no imprisonment. No, I know, but he, there was a sentence here. Oh, yeah, absolutely. And what we would, the government would submit. And what was that sentence? I'm sorry? What was the sentence? The sentence was three years of probation with a split sentence of six months in a halfway house, six months of home detention as a condition of probation. He made a judgment that that was sufficient to carry out the policy set forth in the statute. And, Your Honor, with all due respect to Judge King, who made the decision, what didn't he find? If he truly believed that her role was so low in the organization, he didn't give her a minor role in the offense. He didn't give her the minimal role in the offense. Was it asked for? Was it asked for, by the way? Oh, absolutely. In fact, we asked because she was the number two person in the organization. She was not only the secretary treasurer. She was the point person, as the evidence at trial shows, for the various customers, those 900 customers, when they wanted something, when they wanted to put their cash into the bank, when they wanted to get their cash out of the bank, when they wanted wire transfers going overseas, they went to Dorothy Flowers. We showed in the extensive role she had on the day-to-day operations. I know, but most of what you described could apply to a teller in a bank. Well, again, she was, for instance, amongst other things, she was the notary who notarized the false aliases both for her husband and Mr. Weakley when they opened up bank accounts after a levy was put into place. She basically was also the person who, when Mr. Flowers was out and about in the country promoting the scheme, she was the person running the home operation. She was considered, again, the number two person, and we would draw by comparison Mr. Weakley. Mr. Weakley, who was sentenced the same day and given a 30-month sentence of imprisonment. The judge even found he had mental health conditions. He was described as a secretary or a bookkeeper, and that person was given a 30-month sentence. See, that cuts both ways, though, because it suggests that the judge is looking at these individuals and fashioning individual sentences to fit the circumstances. Well, again, what we submit is that this judge is acting, in this case, arbitrarily and capriciously in disregarding the guidelines, and not using it in any way. Well, but that really doesn't speak to the concern I raised, which is that the judge is supposed to, and the statute instructs him, to fashion a sentence for the individual. He doesn't appear to be disregarding the guidelines generally. He does not appear to be saying this criminal offense didn't amount to anything. He sentenced somebody else to a more substantial figure, and you think that somebody else had a lesser role because he described Mrs. Flowers as number two. I'm not sure I'd share that assessment. Obviously, Judge King did not. But what's wrong with the judge fashioning a sentence which he thinks is appropriate for the individual? I mean, really what I've heard from you so far is it's much more guidelines, set an example for the community, and very little about this individual. Well, again, looking at this individual, and by the way, the best example of the judge not using the guidelines at all as an initial benchmark or for any purpose is that in the second sentencing, the judge found absolutely no tax loss and gave her that sentence of probation with six months of halfway house, six months of home detention. The third sentencing, he found at least a $5 million tax loss and gave her the same exact sentence. That almost per se shows that the judge is disregarding the guidelines because one guideline level called for, in essence, a six to 12-month range. The other one's calling either for a 51 to 63-month range or a 63 to 78-month range. With respect to the individual factors that he talks about, he does talk about subservience to the husband, but he doesn't give her the minor rule. He doesn't give her a duress downward departure. He talks about limited financial recompense that she received. However, she clearly had no other source of income as the pre-sentence report demonstrated, so her benefit for 14 years came from the scheme. Also, she caused 900 other people to reap at least a $5 million benefit. They talked about her, the judge talked about her medical condition. She had a heart attack, but he said in the sentencing, I find that she's in good health at this point. The individual factors that he is absolutely entitled to rely on show that he, but weigh against deterrence, promotion for the respectful law, all the other factors in which you're trying to achieve some type of nationwide consistency. Who else did you prosecute here besides the husband? The husband, Mr. Weakley, there was Mr. Anderson, and then there was at least three other customers. The customers, who were only involved in obviously their own transactions, received 27, 33, and 36 months in prison. Well, why haven't you? You've made the point, I mean, in terms of discouraging other people from doing it, and with respect to the seriousness of the offense. I mean, the real people who need to be discouraged are the taxpayers who take advantage of schemes like this to evade their taxes. I mean, why can't you look at this as an overall picture, look at what you've accomplished by the prosecution? And here's this woman who, in the judge's assessment, whether he gave her a minor role or not, her job here was not, she didn't devise the scheme. She played, you know, her role was more ministerial than otherwise, and he felt that, but for her husband, she would have never gotten into this to begin with. Why can't he make such an assessment? If that happened over one or two years involving 10 or 15 customers, perhaps the judge could say it's not, it's ministerial. Fourteen years when the evidence is showing she's the go-to person in the organization to accomplish what they're doing, when she's the notary herself, falsely notarizing various aliases used by the organization, where she herself deposits hundreds of thousands of dollars of cash, both into the bank and then involves with cash withdrawals. Again, you're right, in some respects, Your Honor, one can view the overall prosecution as a success, but both for the perspective of the outside person who's looking in and saying, well, maybe I can do this, and I'll get the roulette wheel, and I'll be the one who becomes Dorothy Flowers instead of the others. That sends no deterrent message, and also for the other defendants who are sentenced here. When they look at this, how do they say, I got 30 months and she got zero, but she did at least as much as what I did, if not more? To them, it's an unwanted sentencing disparity, and for all these reasons, I would submit the sentence is manifestly unreasonable. Mr. Hogman, before you sit down, I'm going to pose a question to you and Mr. Hobit. You haven't spoken about the sophisticated means enhancement. Am I correct that in one of the earlier sentencing, Judge King imposed the sophisticated means enhancement but then changed his decision this last time around? Is that correct? Judge King imposed it in the first sentence, Your Honor. He imposed it effectively in the second sentence. He found in the first sentence that the scheme was complex. He found that, in fact, the complexity was borne out by the fact that the IRS to date can only identify half the customers because of the way that they utilized coded names, aliases, cash withdrawals, one large commingled commercial account, destroyed records, deleted files, and otherwise made it virtually impossible for the IRS to track the money in and the money out. So we would submit that Judge King got it right the first two times and was outcome determinative on the third time. I read the transcript, and I didn't see much of a discussion on his part other than the fact that they didn't use high technology as the justification. Is that all he said when he changed his mind? He said two things. He talked about high technology, to which our response is they use computers to do all this, and he talked about there being no offshore banks being used, which actually is factually wrong. There are offshore banks used in Switzerland, Austria, and the West Indies, which is one of the examples in the application note for sophisticated concealment. Was she aware of that? I'm sorry? Was she aware of that? Yes. As Lonnie Crockett would give one example, Lonnie Crockett, who had direct... When I say she, I mean the defendant. I'm sorry? The defendant. Was she aware of it? Yes. Lonnie Crockett, the example we give in the briefs, said I talked directly to Dorothy Flower. She was my contact person, and he was the one that was having CPA, Christian Patriots Association, wire transfer monies, in his case, to, I believe it was Austria, in order to accomplish the goal he was doing for his particular clients. So, yes, she was absolutely aware of it. Thank you, Mr. Hochman. Thank you very much. Mr. Hochman. Good morning, Your Honors. May it please the Court, Mr. Hochman. I'll try to answer your question first. The judge said a number of things about not applying the sophisticated concealment enhancement. First of all, Your Honor, he applied it the first time. The second time, because he and the government got into a tiff about tax loss, he found there was no tax loss. There was no tax loss. The sophisticated concealment enhancement doesn't apply. So there wasn't any discussion about it at the second sentencing. Mr. Hochman, let me see if I've got that chronology clearly. Judge King, first time, I'll call it the first sentencing I made, said no tax loss. No, he found the same tax loss and applied sophisticated concealment. Okay, then what happens? The second sentencing, he found no tax loss. Essentially, he felt the government had failed to demonstrate to him where in the record the tax loss showed. Right. The government didn't make any demonstration, so he found, well, if you're not going to show me, I find no tax loss, and he required proof of clear and convincing evidence. He got reversed on both those points the second time. Okay, wait, wait. Oh, I'm sorry. What did he do on sophisticated means the second time? Because he found no tax loss, the sophisticated enhancement doesn't apply where there's no tax loss. Okay. So he didn't discuss it at all. And he got reversed on both of those. Well, he got reversed, but we didn't really talk about it. He didn't really talk about sophisticated enhancement. And then he comes back and says, I'm now free to look at everything again. The court's told me I've been wrong, so I'm now going to review sophisticated concealment. And I find a tax loss because the court of guilt told me I had to do so. He found the same tax loss he did at the first sentencing. Okay, but this time he decided it wasn't by sophisticated means. That's right. All right. And help me on the precedent for sophisticated means. Why isn't a warehouse banking scheme, which involves commingling of funds to make traceability impossible as to individual depositors, the use of offshore accounts, the use of alias names on account holders sufficient to, as a matter of law, to constitute a sophisticated means in a client dispute? Well, first, of course, you've identified that the underlying offense is to impair and impede the IRS. So the offense itself is going to involve concealment and keeping the IRS to find out what's really going on. To sort of answer my question, aren't those sort of the classic examples that we find in other sophisticated tax schemes to throw the IRS off the track? Well, I think this scheme was pretty simple, Your Honor. It essentially involved collecting. Brutally effective. It was effective. Is it sophisticated? And I guess my question really is, what more does the government have to show, in your view, under the precedent to make out a case of sophistication? Well, factually, I think there's some misunderstandings about the fact. First, the Christian Patriot Association and its warehouse bank did not have any foreign bank accounts, did not have any foreign corporations or foreign trusts. There were customers. Well, the customers did. Yes. And they transferred money to those accounts, some of which were identified only by numbers as opposed to names. Well, that's correct, Your Honor. But it was the customers. But your client knew that when they transferred the money because I presume you've got to make instructions as to what account the money's being transferred to. But if we look at the conduct of their offense, the warehouse bank was, well, you say brutally effective. Pretty simple. Because all it did is they collected money that came into a barn in Boring, Oregon, where with pencil and paper they kept track of who the money belonged to, and then they deposited it all into a single bank account at a U.S. national bank in Gresham, Oregon, not too far away from the barn. Then customers would call in and say, I want my money, I want it paid here, I want it paid there. Some of the customers had sophisticated operations going on, like Lonnie Crockett, who had a foreign bank account, and he would ask Christian Patriot Association, instead of paying my mortgage, please transfer my money to my bank account offshore. Why isn't that all acts of furtherance of a client conspiracy? Well, it is in furtherance of a client conspiracy, but I don't find it. And it's an overt act, isn't it? It's an overt act, but I do not find it that the offense that they committed involves sophisticated concealment, where it's the customer who has the foreign bank account and the foreign trust, and not Christian Patriot Association. They didn't set any of those things up. I'd be with you if we had separate conspiracies, but where you're losing me is all of the members who were sentenced here, whether they be customers, Mr. Flowers as the mastermind of the scheme, his wife, Mr. Weakley, another employee, they're all co-conspirators of the same client tax conspiracy, and they're all liable under Pinkerton theory for overt acts that are reasonably foreseeable in furtherance of the conspiracy. And why shouldn't the district court take that into consideration in determining whether or not this particular scheme to evade taxes and to obstruct the Internal Revenue Service from identifying and collecting them was sophisticated? Well, I think Judge King drew a distinction between foreign bank accounts, companies, and trusts set up by the conspirators in this prosecution versus customers who used the warehouse bank who may have had foreign bank accounts, trusts. So he found and makes the finding in the third sentencing hearing that this is a case that did not involve foreign bank accounts. And the only thing he could have meant by that Well, I think it did show that. I think it's not clearly erroneous. I think it is true that the Christian Patriot Association, that its warehouse bank did not have any foreign bank accounts, trusts, or corporations, while some of the people who used the services of warehouse bank did. So I don't think it's clearly erroneous, and I may not be able to convince you of that fact, but I don't believe that. Where I'm having trouble is just, I think I know what a client tax conspiracy is. It walks like a client tax conspiracy. It talks like a client tax conspiracy. Well, it is a client tax conspiracy. It quacks like a client tax conspiracy. It's a different question whether it's an overt act that the Christian Patriot Association sent money to Lonnie Crockett's account, and whether that's an overt act and further the conspiracy, and whether it involves, by these folks, sophisticated concealment. And I don't think that the... Let me put it a different way. If we were to disagree with you and say, no, Judge King just didn't understand as a matter of law what a client tax conspiracy is and what the significance of this evidence was as it related to this case, is that an error under step one of the sentencing process that we go through now? It is. Okay. So we would have to reverse and remand... Well, I don't... The Hardy case speaks of significant procedural errors, and I think that a harmless error analysis can apply in those cases. And so the court, I do not think, has to send it back. You know, this case is six years old. We've been through three sentencings. I'm confident that Judge King believes that an appropriate sentence for Dottie Flowers is three years' probation with the split sentence. Indeed, that's really the question here, because you can talk about adding a couple levels for sophisticated concealment, but he made very clear the last time around that I don't need no stinking levels. I mean, he went from 12 to 14 in a blink of an eye when he discovered that's what he had to do to get to the result he wanted. And so the problem posed here, and we're seeing it in a lot of cases right now as we get to the new sentencing environment, judges are trying to get to the same result both ways because they're not quite sure which one is going to trump. So they calculate guidelines in a way that reaches the desired result, and this is about the most apparent example of that I've ever seen. Well, and I invited him to do that in sentencing because I didn't know what the right way to proceed was. Well, let me ask you to speak directly to that. We have here a situation where the guidelines are being applied in such a way as to reach a result. I think it's kind of inescapable the way that we went from 12 to 14. He knew the result he wanted. He had to go to 14 to get there by the guidelines, so he did. Now, he can go outside the guidelines because the guidelines are only advisory. So the question that we have to deal with is, which does trump? If we conclude that, well, the guidelines were misapplied, but he's going to get to the same result anyway, so it's harmless error from a guidelines perspective, is that still something that he should be allowed to do because it doesn't make the sentence unreasonable? Too many negatives in there, but I think you get the drift of it. Why is it the district judge should be able to go that far? Well, Your Honor, if you believe the language in Cardi that it is a significant procedural error, I think the Court can analyze, as you have just done, what happened at the sentencing hearing. And since Judge King got there both ways, by applying a 355-3A analysis and by departing from the guidelines as he did at the first sentencing, I think the Court can look at the record and decide that based on his assessment of Dottie Flowers' role that there's no point in sending it back, that it's not a, while it's a procedural error, it's not a significant procedural error, and you can apply a harmless error analysis if you are unpersuaded by my argument about sophisticated concealment. To what extent did the evidence show that she was aware of the full scope of this conspiracy? Well, I think it showed that she wasn't, Your Honor. I think there was, the government talks about her role as vital, and while I suppose the bank needed a receptionist and needed somebody to take the funds and make a deposit, that was essentially her role. There's an undercover... There's one particular piece, and the government mentioned here, that I want you to deal with, and that's her role as a notary, because that was something that she apparently specifically knew what she was doing was false and untruthful. Well, I'll tell you the two instances that are cited by the government in its brief as to her role as a notary. One, Richard Flowers used the name of Tom Bent, and she notarized his signature when he purchased the 1973 Volvo. Now, I can't remember, frankly, what the argument was that made that transaction relevant in our case, but that's one example, which I think had little to do with the operation of the warehouse bank. The other example is that she notarized the signature for John Anderson, who was usually an alias in a real property transaction, but there was no evidence in the record at the time that she notarized the signature that she was aware that this person wasn't who he claimed to be. It was only later at the trial that she learned that it was John Anderson. So those are the two examples that are cited in the government's brief that have little to do with the warehouse bank, in my view. All right. Thank you, Mr. Hoffman. Thank you. Mr. Hoffman, I'll give you a little time on rebuttal. Thank you. This is a very difficult issue. This Court is seeing in many of these cases on how to treat the guidelines vis-à-vis the 3553A factors. Here, this is a... If ever there was a case in which a judge disregarded the guidelines to reach an outcome, it is this case. What's your response to Judge Clifton's questioning of Mr. Hovind on that? I mean, we can send it back, and we can give him a primer on client conspiracies and tell him, you've got to recompute the guideline, and, okay, now it's two levels higher than it was before. And then he's going to apply the 3553A factors, given her age, her health, and so on, all the other things that he cited. He's going to explain his justification for going down and imposing the same sentence. And she walks out of the courtroom with exactly the same sentence that she had. It will be a procedurally correct sentence, but we would have to declare the sentence to be unreasonable as a matter of law... And we are seeking that. As it's been held in other circuits and other similar types of cases where a judge refused to give any imprisonment, and the courts found that the refusal to give any imprisonment was unreasonable as a matter of law, we are asking for that finding in this case. And what do you think is a reasonable sentence here, by the way? Well, at a minimum, the sentence the judge gave in the first sentence, the year-and-a-day sentence, while we argue that that was an insignificant sentence compared to what we were otherwise seeking, which was 60 months at the time, certainly that sends some message that you can't do this extensive crime and get away, in essence, spot-free. So a year-and-a-day is basically 10 months? Ten months and... A few days. A few days, as opposed to what he had already given her, which is a split sentence of how much? I forget what you said. Your Honor, here's the thing... I mean, what was it against? A split sentence of six months in a halfway house and six months in home detention? I forget what... What was the sentence? It was a 6-6 split. Halfway house and home detention. Well, halfway house is no picnic. It's not jail, but it's not a picnic either. Correct. But what the studies have shown, Your Honor, in white-collar cases, particularly ideologically motivated white-collar cases, and as Your Honor pointed out before, she wasn't necessarily doing this for financial gain. In these types of cases, imprisonment speaks loud and clear to people who are contemplating whether or not to do these cases. And to what extent, again, could you go, was she aware of the full scope of this? I mean, you heard the explanation for the false notarization. I mean, to what extent was she aware of the full scope of what she was doing here? The evidence at trial is that she was absolutely aware of the full scope of the operation for the 14 years. The point that defense counsel was making is that she was, in many cases, acting at the instruction of her husband to do the various acts, but she certainly knew what the various acts were accomplishing. So, again, we would conclude by asking this court, and the court also has another option available under 28 U.S.C. 2106. That's the... She wants to reassign? I'm just suggesting... I'm not asking you to reassign the case, but under... You're just sort of citing the statute of passing in case we might think about it. Well, to the extent that... Are you asking for her case or not, counsel? I defer to the court on whether or not, in situation... We don't normally sue a sponte remand and direct resentencing to a district judge unless somebody asks and gives us a darn good reason to do it. They don't like it when we do it, so if you're asking for the relief or you're not asking for it, it's a lot of drive-by. At this point, I'm not in a position to ask for that relief, but it was in answer to Your Honor's question of if a judge persists in doing something that this Court believes is inappropriate, that being continually giving no imprisonment where at least some imprisonment is warranted, the Court under the Alfaro case, United States v. Alfaro, a judge who gave 66 months of imprisonment in three consecutive drug sentencings where the Court basically said it should be substantially higher, eventually reassigned the case. I'm not... We understand your position, Mr. Hoffman. Thank you very much. Thank you very much. The case just argued is submitted, and we will now hear argument in the case of D'Angelo v. Roy Turner v. Guy Hall, Jefferson v. Bartlett. Meeting adjourned.
judges: Tallman, Clifton, Korman